# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Cellular device, presently securely stored in evidence at the Wisconsin Department of Justice-Division of Criminal Investigation Milwaukee Field Office and fully described in Attachment A

Case No. 18-M-142 (DEJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Cellular device, presently securely stored in evidence at the Wisconsin Department of Justice-Division of Criminal Investigation Milwaukee Field Office and fully described in Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 1591(a)

The application is based on these facts: See attached affidavit.

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_

Amy Mentzel, FBI Special Agent
_Printed Name and Title_

Sworn to before me and signed in my presence:

Date: Aug. 21, 2018

_Judge's signature_

City and State: Milwaukee, Wisconsin

David E. Jones, U.S. Magistrate Judge
_Printed Name and Title_

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Amy L. Mentzel, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since 2006.

2. I am currently assigned to the Wisconsin Human Trafficking Task Force ("WHTTF") and was previously assigned to the Southeast Michigan Crimes Against Children Task Force. My duties as a Special Agent with the FBI include human trafficking investigations involving minors and adults. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable. Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

## PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search a cellular phone, presently securely stored in evidence at the Wisconsin Department of Justice-Division of Criminal Investigation Milwaukee Field Office and fully described in Attachment A, for the things described in Attachment B.

5. Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that Charles Moore has committed violations of Title 18, United States Code, Section 1591(a).

1

6. Because this affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a warrant to search the cellular phone described in Attachment A (hereinafter "the Device"), this affidavit does not set forth all of my knowledge about this matter.

## SUMMARY OF THE INVESTIGATION AND PROBABLE CAUSE

### A. Interviews of AV-1's Grandmother

7. In June 2018, I became a case agent on a WHTTF investigation concerning Charles B. Moore, a black male with a date of birth in June 1990. I began by reviewing the information previously documented by FBI Special Agent Heather Wright.

8. On September 13, 2016, SA Wright received a phone call from the grandmother of an adult victim (hereinafter AV-1), who has a date of birth in November 1995. AV-1's grandmother explained that she had reported AV-1 missing in in August 2016. AV-1 had left her mother's residence in Milwaukee, Wisconsin with an unknown male subject and was in south-central Los Angeles. The male AV-1 left with was later identified as Charles Moore.

9. AV-1's grandmother learned that AV-1 was using "crystal meth." The grandmother reported that she was concerned because AV-1 had posted "selfies" on Instagram with bruising and swelling to her face. AV-1's grandmother showed SA Wright a series of messages she had exchanged with AV-1 where AV-1 alternated between asking for help and insisting she wanted to stay with Moore because he treated her well. Based on these facts, AV-1's grandmother was concerned that Moore might be a pimp and that AV-1 might be a victim of sex trafficking.

10. On August 26, 2016, when Moore found out that AV-1 had been texting her grandmother, Moore called the grandmother and told her that he had taken AV-1's cell phone and kicked AV-1 out because she "wasn't doing her job." On another occasion, Moore told AV-1's grandmother that AV-1 "wasn't going anywhere" and that AV-1 owed him "so much money."

2

11. AV-1's grandmother continued to communicate with Moore and AV-1, attempting to convince them that AV-1 should come home to Milwaukee. In October 2016, AV-1 escaped from Moore and traveled back to Milwaukee on a Greyhound bus with a ticket purchased by AV-1's grandmother.

**B. October 2016 Interview of AV-1**

12. On October 26, 2016, SA Wright and WHTTF Officer Neal Lofy interviewed AV-1. AV-1 disclosed that she was trafficked by Moore in August of 2016. AV-1 indicated that Moore approached her in a vehicle while she was on the street in Milwaukee and offered her a plane ticket to California if she would come with him. AV-1 said she called Moore from a friend's phone later that day, and Moore took her from Milwaukee to the area of Los Angeles, California for the purpose of prostituting her.

13. AV-1 completed prostitution "dates" in southern California every day and provided all of the money she earned from the dates to Moore because he threatened her with violence. AV-1 estimated that she made approximately $1,000 a day for Moore.

14. AV-1 explained that she would do prostitution dates in the hotel rooms where she and Moore were staying during the day, and she would walk the streets soliciting more dates at night. While AV-1 walked the "track," Moore would watch her from their hotel room or his car. AV-1 knew Moore was watching her because he would call and yell at her if she sat down or stopped actively soliciting dates.

15. Moore had rules that AV-1 had to follow, such as addressing Moore as "King Serve;" walking with her head down, especially around other black males; and verifying that clients were not law enforcement before conducting a date. If AV-1 broke a rule, refused to work, or cried, Moore would beat her. On one occasion, AV-1 tried to escape in a stranger's truck. Moore pulled AV-1 back by her hair and bit her elbow. Moore told AV-1 that he wanted to tear off her skin.

3

16. On another occasion, Moore beat AV-1 because she asked him to go and buy her a sandwich. Moore became so angry that he broke the table, the television and the couch inside the hotel room. Moore was arrested for this incident and convicted of misdemeanor battery. An NCIC/DOT records check revealed an open protection order in California specifying that Moore could not have any contact with AV-1 as a condition of probation. The order expires on April 4, 2021. Moore also has an active probation warrant in that case.

17. Moore also controlled AV-1 in other ways. AV-1 had drug addictions prior to meeting Moore. Moore manipulated those addictions, refusing to give her heroin when she was extremely sick in withdrawal unless she first earned money for him through prostitution. Moore fed AV-1 methamphetamine to keep her awake through the night doing prostitution dates. Moore further controlled AV-1 by keeping her driver's license.

### C. January 2017 Interview of AV-1

18. SA Wright interviewed AV-1 again on January 10, 2017. AV-1 went over her prior statement with SA Wright. At that time, she stated that when Moore first told AV-1 to get into his vehicle, AV-1 refused. She did, however, accept a bottle of water from Moore, which she drank. Shortly thereafter AV-1 lost consciousness, and she later awoke inside Moore's vehicle. They traveled to an airport hotel where Moore made AV-1 do a prostitution date. From there, they went to O'Hare airport in Chicago and eventually made their way to Los Angeles.

19. AV-1 further disclosed that in December 2016, after AV-1 had escaped back to Wisconsin, Moore had found AV-1 and "grabbed" her off the street in Milwaukee. AV-1 said that Moore and two other males kicked, punched, and choked her, then forced her into their vehicle. Moore accused AV-1 of lying to the police about him and said he would be taking her to California and New York to prostitute for him. He continued punching and choking AV-1 until she had a seizure.

20. Moore took AV-1 to a sparsely-furnished "trap house" in Milwaukee that had black garbage bags taped over the windows. Moore handcuffed AV-1 to a chair in the kitchen and kept her

4

in that house for approximately one week. Moore then moved AV-1 to a second home, where he duct-taped her feet, hands, and mouth and placed her into a bathtub. After approximately two days at the second location, AV-1 was able to cut herself free and escape. AV-1 used a stranger's cell phone to call friends who came get her.

### D. June 2018 Interview of AV-1

21. Wisconsin Division of Criminal Investigation (DCI) Special Agent Melissa Fus and I interviewed AV-1 on June 20, 2018. AV-1 told us that in late May 2018, Moore had again found her, this time outside of her grandfather's apartment building. Moore grabbed AV-1's arm and brought her to a vehicle where another male was waiting in the driver's seat. Moore made AV-1 sit in the back seat between him and a pile of items packed on the rear passenger side so that she could not escape. AV-1 was fearful of Moore because of his past violence toward her, so she did not resist.

22. The driver took them to his residence in Milwaukee, where they stayed for the remainder of that day. The next day, Moore and the driver purchased and smoked marijuana. Moore asked AV-1 if she wanted any drugs, and AV-1 told Moore that she no longer used, causing Moore to slap AV-1.

23. At approximately 5 p.m., AV-1 and Moore left the residence to pick up another female, hereinafter referred to as Juvenile Victim 1 (hereinafter JV-1), who has a date of birth in November 2000. AV-1 described JV-1 as a skinny black female who had a baby who was approximately nine months old. Moore instructed AV-1 to accompany JV-1 inside JV-1's home to find shoes, and she remembered seeing a Hispanic adult male inside. Based on a subsequent interview of JV-1's mother, I believe that this male was JV-1's mother's boyfriend.

24. After picking up JV-1, Moore drove to the Greyhound Bus Station in Milwaukee. That evening around 6:30 p.m., AV-1, JV-1 and Moore took a bus to Chicago. From the Greyhound station in Chicago, they took an Uber ride to the Skylark Motel near 48th Street and Cicero Avenue.

5

25. The following morning, Moore went to a store to obtain cell phones for AV-1 and JV-1. Moore instructed JV-1 to call him if AV-1 attempted to leave. Moore returned with two cell phones installed with a tracker application, Family 360, so that he would know where AV-1 and JV-1 were at all times.

26. Moore instructed AV-1 and JV-1 to walk the streets soliciting prostitution dates. AV-1 and JV-1 walked the area of 50th Street and Cicero Avenue while Moore watched from the motel room. AV-1 did not want to do dates, so she just walked. According to AV-1, JV-1 completed approximately six "car dates," meaning JV-1 performed sexual acts with the customers in their vehicles. After her dates, JV-1 took the money she had made back to the motel and gave it to Moore.

27. After a second day of street walking in Chicago, AV-1 waited until Moore and JV-1 had fallen asleep, then grabbed the cell phone that Moore had bought her and left the motel. AV-1 called a friend who lived in the area, and the friend came to pick her up. AV-1 turned off the phone so that Moore could not track her location. The next day, she turned it back on and deleted the tracking application.

28. AV-1 indicated that as of early June, Moore and JV-1 were still in Chicago but had plans to travel to California. This was later corroborated by interviews of JV-1's mother, JV-1's posts on social media, and recorded jail calls between Moore and an adult female with the initial A.Z.L.

29. On June 22, 2018, AV-1 was shown a photo of JV-1 and recognized JV-1 as the female whom she picked up with Moore. AV-1 also recalled that this female went by the nickname "Seven," which I know to be consistent with JV-1's Facebook vanity name.

### E. Evidence Concerning Moore's "Bottom"

30. AV-1 told SA Wright in her interviews that Moore considered her and another female whom she knew to be in custody at the Milwaukee Secure Detention Facility to be his "money makers." AV-1 knew about the other female because that female wrote Moore letters from jail while AV-1 and Moore were in California. AV-1 turned over some of these letters to SA Wright. Moore

6

would also talk to this female on the phone while AV-1 and Moore were together. This female was subsequently identified by law enforcement as A.Z.L., with a date of birth in January 1996.

31. In reviewing SA Wright's reports, SA Fus found four phone numbers that AV-1 and her grandmother had given for Moore: 414-207-XXXX, 323-489-XXXX, 312-409-XXXX, and 414-587-XXXX. After researching these numbers, SA Fus located Backpage prostitution ads listing phone numbers 414-207-XXXX and 312-409-XXXX. These ads were connected to other ads that used the same pictures but listed a phone number of 312-966-XXXX. One of the females frequently depicted in these ads appears to be A.Z.L.

32. On June 8, 2018, SA Fus conducted an NCIC/CIB record check on A.Z.L. and noted that she is currently in custody at the Milwaukee Secure Detention Facility. I requested recordings of A.Z.L.'s jail calls and the associated call detail records. Mark Weisberger of the Wisconsin Department of Corrections noted that A.Z.L. often speaks with a male using a phone number of 661-585-XXXX. Based on the names used, the contents of the conversations, and subsequent connections to this phone number, I believe the male to be Moore.

33. A.Z.L. calls Moore "Daddy," a term I know from my training and experience to be a title that many pimps or sex traffickers insist being called by the women whom they prostitute. Moore calls A.Z.L. "Barbie Doll," a name she also uses for herself. He also refers to her as his "boss bitch."

34. Moore frequently talks about his desire to get money in these calls. He tells A.Z.L. that when she gets out of custody, they are going to make "50 bands" or $50,000 in sixty days. When A.Z.L. later informs him that she will not be getting out of custody for another 18 months, Moore becomes extremely upset and tells her that this is going to "fuck up" his "pimping." In a subsequent call, Moore says he does not blame A.Z.L. for being in jail. He says he blames himself for not staying "pimped tight" on his "hoe."

35. A.Z.L. expresses fear and distrust of Moore in some of the conversations. In one, she says Moore is scary when he is angry, so she knows not to "play" with him. In another, A.Z.L. says

7

she does not trust Moore to take care of her when she gets out, so she is going to make it on her own. Moore says he will "beat her ass" when she gets out and refers to A.Z.L. as his "bank."

36. In a conversation on June 1, 2018, Moore talks about having a new female who had made him $1,500 in one night and $500 the next. Moore tells A.Z.L. that he and the female are in Chicago with possible plans to go to California. At times in the calls, the female is referred to as "Seven Heaven," JV-1's vanity name on Facebook and the nickname that AV-1 recalled was used by JV-1 while prostituting.

37. In many of the conversations, A.Z.L. appears to express displeasure over how little money the new female is earning for Moore. She urges him to pimp hard and to put his foot on the girl. Moore replies that his foot is already down. Moore reassures A.Z.L. that everything is going well because he has "two bad bitches." A.Z.L. tells Moore to instruct Seven Heaven to keep her head down, stay loyal, and say no to drugs and yes to money.

### F. Interview of JV-1's Mother

38. On June 20, 2018, SA Fus received a National Human Trafficking Hotline tip made by the mother of JV-1. JV-1's mother identified her as a 17-year-old female who had a 9-month-old baby. The tip indicated that JV-1 had run away with an adult male who had a Facebook profile name of "Mashin Jordan." JV-1 had recently called her mother several times late at night, and vehicular traffic could be heard in the background. JV-1 told her mother that she was "working" in California and would return home soon. In earlier calls, JV-1 told her mother that she was in Cicero, IL.

39. On June 22, 2018, SA Fus and I interviewed JV-1's mother, regarding the tip. JV-1's mother stated that on approximately May 18, 2018, JV-1 met a man on Facebook whose account was under the vanity name "Mashin Jordan." JV-1 and "Mashin Jordan" began "inboxing" each other on Facebook, and JV-1 ran away from home with him approximately one week later on May 25, 2018.

40. JV-1's mother learned about the Facebook communications when JV-1 briefly returned home on May 28, 2018. JV-1's mother confiscated JV-1's cell phone and turned it over to the

8

Milwaukee Police Department for examination. JV-1 became hysterical when the phone was taken. She lay down in the middle of a busy street, saying that she wanted to die.

41. By the evening of May 29, 2018, JV-1 had run away again. Before she ran away, JV-1 asked to use her mother's phone, and she dialed telephone number 661-585-XXXX, the same number frequently dialed by A.Z.L. in custody. Shortly thereafter, JV-1 left with an unknown white female, believed to be AV-1.

42. JV-1's mother stated that on June 3, 2018, JV-1's younger sister had followed JV-1's SnapChat location to Chicago, Illinois. JV-1's sister was visiting her paternal family in the Chicago area, and she located JV-1 on Cicero Avenue. I am familiar with Cicero Avenue in Chicago as a location known for street walking and prostitution. JV-1's sister told their mother that JV-1 was dressed like a prostitute. JV-1's sister confronted JV-1 and asked what JV-1 was doing there. JV-1 first said that she was working, then that she was waiting for a ride to work. JV-1's sister took a photo of the two of them together and sent it to their mother.

43. JV-1's mother kept in contact with JV-1 on various social media platforms. JV-1 also contacted her mother from phone number 818-613-XXXX. JV-1 told her mother that the man she was with, whom she referred to as "King" and "Daddy," was going to get her into acting and modeling. JV-1 sometimes sent pictures of herself in California to her mother.

44. On June 27, 2018, JV-1's mother reported that she had received a texted photo of JV-1 lying in a bed with her eyes closed and wearing what appeared to be a hospital gown. The message with the photo read, "She's in the hospital." JV-1's mother had phone contact with JV-1 shortly after receiving the photo. JV-1 said she was in the hospital being treated for dehydration and that she was going to have an ultrasound done. JV-1 then ended the call.

### G. Examination of Cell Phone Confiscated from JV-1 by Her Mother

45. On July 3, 2018, the phone JV-1's mother confiscated on May 28, 2018 was forensically examined with consent from JV-1's mother. The extracted contents of the phone were

9

organized into a digital forensic report. Within that report, a Timeline section synthesizes text messages, call logs and calendar appointments in chronological order.

46. JV-1 has a contact saved in her phone as "King" with a phone number of 661-585-XXXX. This is the same phone number frequently dialed by A.Z.L., Moore's "bottom," from custody. Based on the phone number and the content and timing of the messages, I believe "King" to be Moore.

47. Text messages between JV-1 and Moore begin in this phone on May 18, 2018 and continue through May 28, 2018. Recurring themes in the messages include making money, traveling to Chicago and California, and the details of prostitution dates.

48. JV-1 refers to Moore throughout the messages as "Daddy." On May 23, 2018, Moore called JV-1 but she did not answer. A few minutes later, she texted him back, "Yooo." Moore immediately replied, "That's how you respond to your Daddy?" and, "It's Daddy at all times." Moore often refers to JV-1 in the messages as "Big 7," which may allude to her nickname of "Seven Heaven."

49. The text messages exchanged between May 19, 2018 and May 21, 2018 indicate a grooming period, where Moore is persuading and readying JV-1 to travel with him and to engage in prostitution. Moore asks to meet up with JV-1. He sends her photos of himself and of large stacks of cash. In the afternoon on May 20, he texts her, "Nothing, comes between my money and you are my money so UK I'm super serious about you." On May 21, Moore tells JV-1 that they will probably go to Chicago that night. When JV-1 asks what to do about her baby, Moore tells her to leave the baby with her mother. He says that there is nothing for them in Milwaukee and that "this is the only way."

50. The first messages suggesting JV-1 had begun doing prostitution dates for Moore appear on May 22, 2018. The brief texts say things like "Got one" or "Done," along with numbers like "80" and "100" that in my training and experience correspond to dollar amounts earned. That night, Moore texts JV-1, "You belong to the game, and the game pick in [sic] choose and you were the chosen one." Moore follows this message up with a number of images with slogans about pimping,

making money, and loyalty. He sends JV-1 a photo of himself and a photo of A.Z.L., telling JV-1 that they are her new family now. Later that night, he texts JV-1, "Hollywood division here we come!!"

51. Between May 23 and May 25, 2018, the messages show that Moore and JV-1 are biding their time before they can leave the state together. Moore tells JV-1 that he will not let her down and that she will be the center of his "operation." He tells JV-1 to download the application Life360 onto her phone so that he can track where she is at all times.

52. Finally, on May 26, 2018, JV-1 left town with Moore. Throughout the day, JV-1 missed numerous calls from her mother, her grandmother, and several of her friends. Many of them also sent text messages that went unanswered. Around midnight JV-1 and Moore had the following exchange:

| | |
|---|---|
| CeCe: | I got one in the Walmart parking lot |
| Moore: | I know the Jeep |
| CeCe: | Yes |
| Moore: | Go get that money girl |
| CeCe: | Ok |
| CeCe: | Daddy |
| CeCe: | *unknown image sent* |
| Moore: | Most definitely am & Yes THE MONEY TEAM!? |
| Moore: | Don't waste your time doing to much talking lil lady |
| CeCe: | I know |
| Moore: | What he on? Let him know your time not to be wasted in get right to business ok get right to the point |

53. The messages reflect that Moore continued to coach and supervise JV-1 conducting prostitution dates throughout that night and into the next day. Around 1 a.m. on May 27, 2018, the following exchange occurred:

11

| | |
|---|---|
| CeCe: | Daddy |
| CeCe: | 150 |
| Moore: | What's up? |
| CeCe: | He's taking me to a motel |
| CeCe: | I got a whole 200 now |
| Moore: | K. Go to one of the hotel on Cicero in [sic] let him know that |
| Moore: | Everything good? Make sure you watch him I'm stay on your peas and queues never let your guard down |
| CeCe: | Daddy what's the motel name to call? |
| CeCe: | He's took my [sic] to bank n gave me the money |
| Moore: | So u at the bank right? |
| Moore: | He can take you to the cicero motel it's right on 45 in Cicero |
| Moore: | Or the shamrock on Roosevelt and Cicero |

Based on my training and experience, I know Cicero Avenue in Chicago to be a prostitution "track" where commercial sex is offered on the street. I also know the Cicero Motel and the Shamrock Motel to be two hotels in that area frequently used for prostitution dates. After an hour had passed, Moore texted JV-1, "Ayeee hurry it up at less [sic] he spending more money."

54. Messages referring to dates and dollar amounts earned continue until approximately 4:30 a.m. that day. Moore calls JV-1 "hoe" and tells her to "get that money."

55. The following day, May 28, 2018, messages concerning prostitution dates resumed in the early morning hours. A potential customer using phone number 773-620-XXXX texted with JV-1 about whether she could come to his home versus a motel, how much she charges, and whether she is willing to engage in anal sex. Moore's messages indicate that he has set a daily quota for her of $600. JV-1 texts him before and after each date, and Moore adjusts how far she has to go before reaching the $600 mark. Once she reaches it, around 5:30 a.m., he makes arrangements to meet her in a parking lot.

12

56. That afternoon, JV-1 and Moore appear to have an argument because JV-1's family wants her to come home. After a short phone call, Moore finally texts JV-1, "You sound stupid baby go get a life." This is the last text message between Moore and JV-1 in this phone. Later that day, JV-1 returned home, and JV-1's mother confiscated the phone.

**H. Moore's Facebook Account**

57. Investigators identified the "Mashin Jordan" Facebook account that AV-1's mother had reported. It appears that Charles Moore controls this account. The "Intro" section of that Facebook page has the statement, "Mr. SERVE THEP FROM MILWAUKEE TO CALIFRONIA!!.." Notably, AV-1 knew of a past Facebook account for Moore under the name "MR SERVE THE P." Pictures posted on the page matched Moore's appearance in his WI Department of Transportation Identification Card photo.

58. Many memes and status updates posted to the "Mashin Jordan" Facebook page make reference to prostitution. For example, one talks about "hoe problems and pimp solutions," and another advises, "Make $$$ in your Spare Time! Become a Hooker!! STOP GIVING IT AWAY!!"

59. Several posts corroborate the details related to me by AV-1 and by JV-1's mother. A post from June 2, 2018 reads, "If you are certified believer most definitely going to receive what you believe." The post contains emojis, including stacks of cash with wings and airplanes. Below this caption, there are two images: a photo of Moore with JV-1, and a meme that reads "you hoes keep forgetting that HE is the prize your [sic] just the winner." JV-1's Instagram account was tagged with the post. Other posts from June 3, 2018 read, "Goodbye Midwest!!!" and, "I'm going back to California tomorrow," with more cash and plane emojis.

**I. Recovery of JV-1**

60. JV-1's mother continued to gather and pass along information on Moore and JV-1's location. On Monday, July 24, 2018, JV-1's mother, reported that she received a phone call from JV-1. JV-1 told her mother that "they" were driving to Texas. JV-1 later reported to her mother that JV-1

13

was getting "jumped" by several females in California who kept taking her money and her shoes, so they decided to travel to Texas.

61. On August 8, 2018, JV-1's mother received a phone call from the Dallas Police and Houston Police Departments. JV-1 had been recovered and was being transferred from Houston to Dallas to a shelter. JV-1 told her mother that she had police contact because Moore "beat her ass," however JV-1 told me that the incident involved another male and not Moore. A short time after arriving at the shelter, JV-1 left with Moore. JV-1's mother provided the new cell phone number for JV-1 as 818-745-XXXX.

62. JV-1's mother also reported receiving phone calls from a male subject she believed to be Moore (whom she called "Mashin Jordan") while JV-1 was in the shelter in Dallas. JV-1's mother indicated that Moore had called her from 661-585-XXXX. Moore told her that he had just became aware that JV-1 was only 17 years of age. Moore asked JV-1's mother what he should do because JV-1 was calling him from the shelter in Dallas. JV-1's mother told Moore told to bring JV-1 home. At 6:31 p.m., on August 8, 2018, JV-1's mother received a text message from Moore that read "she wit me."

63. On August 10, 2018, JV-1 called her mother from a new phone number, 818-745-XXXX. JV-1 indicated that she got a new phone because Moore broke her old phone. JV-1 also told her mother that JV-1 and Moore were arguing over her age.

64. On August 17, 2018, JV-1 was recovered by the Chicago Police Department at the Skylark Motel on Cicero Avenue. JV-1 was found with Moore, who was arrested for an open warrant from Long Beach, California. JV-1's mother drove to Chicago to get JV-1.

### J. Interview of JV-1

65. On August 20, 2018, SA Fus and I interviewed JV-1 regarding her contact with Moore. JV-1 said she left Milwaukee with Moore and another female she knew as "Snow White" or "Strawberry." JV-1 said they took the bus to Chicago. Upon arriving in Chicago, she walked the

14

"track" on Roosevelt Avenue soliciting prostitution dates. JV-1 said that "Snow White" left her and Moore shortly after they arrived in Chicago. JV-1 said after Chicago, she and Moore went to California, and then to Texas.

66. JV-1 said that she and Moore were "a team" and that she called Moore "C." JV-1 admitted to completing prostitution dates for money while in Chicago, California, and Texas. She also said Moore would provide security for her while she completed her dates. JV-1 recalled an occasion when she needed help during a date. Moore responded right away because he was monitoring her and already knew where she was.

67. JV-1 estimated that she would complete an average of 6-12 dates per night. She said she would do "car dates" and also dates with regular or repeat clients in hotel rooms. JV-1 said she would give money to Moore for his basic needs, but claimed she kept money as well.

68. JV-1 indicated that she was friends with Moore on Instagram and his account name was "Mr the P." JV-1 believed the title of his Instagram account meant "Mr the Player."

69. JV-1 said that on August 17, 2018, she and Moore were walking from her hotel to the Barber Shop which was near "The Scarlet" in Chicago when they were intercepted by the police. JV-1 indicated that Chicago Police took her cell phone.

70. At the conclusion of the interview with JV-1, contact was made with JV-1's mother. JV-1's mother indicated that JV-1 was still in possession of her cell phone. She stated she had personally observed the Chicago Police officer return JV-1's cell phone when she picked JV-1 up in Chicago on August 17, 2018. JV-1's mother accurately described the cell phone as a gold Metro PCS Motorola G cell phone. JV-1's mother said she attempted to have JV-1 discard the phone, but JV-1 refused. JV-1's mother also said JV-1 received jail calls on the phone from "Mashin Jordan" (Moore) on August 19, 2018.

71. On August 20, 2018, contact was reinitiated with JV-1. It was determined that JV-1 had withheld information as she was in fact in possession of a cell phone concealed in her bra. The cell

15

phone was a gold Motorola GK40 cell phone with IMEI number of 354135092304373. This cell phone is the subject of this search warrant application and referred to as the Device.

72. For fear that JV-1 would further conceal, destroy, or run away with the Device and the evidence it contained, I determined that the Device would need to be seized pursuant to an exigency and a search warrant obtained.

73. JV-1 denied having the phone and attempted to enter her mother's home. I stopped JV-1 from entering the house by placing a hand on her arm, and I was able to see the Device protruding from the left side of her shirt. JV-1 became extremely agitated. She protested that she had already deleted everything having to do with Moore from the phone, and initially refused to provide the phone. SA Fus and I requested assistance from an additional investigator, and eventually JV-1 threw the phone on the ground, allowing us to recover it. The phone was not visibly damaged by the fall.

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

74. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

75. I also know that electronic storage device files or remnants of such files can be recovered months or even years after they have been deleted. When a person deletes a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space, that is, in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten. In addition, if the electronic storage device uses an operating system (in the case, for example, of a computer, cellular telephone or tablet device) the device may also contain a record of deleted data in a swap or recovery file.

16

76. I know that when an individual uses or is instructed to use an electronic device to further a sex trafficking operation, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime, including data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

77. Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying the Device, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

78. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## Conclusion

79. Based on the facts set forth above, I respectfully submit that there is probable cause to issue a warrant to search the Device described in Attachment A and to seize the evidence found therein described in Attachment B.

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is the a gold Motorola GK40 cell phone with IMEI number of 354135092304373, currently secured with the Wisconsin Department of Justice-Division of Criminal Investigation Milwaukee Field Office on property inventory #18-4107/19.1 and located at 633 West Wisconsin Avenue, Milwaukee, Wisconsin, 53203.

ATTACHMENT B

All records on the cellular phone described in Attachment A that relate to violations of Title 18, United States Code, Section 1591(a) (Sex Trafficking of Children or by Force, Fraud or Coercion) and involved Charles B. Moore, including:

    a. All stored electronic communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

    b. All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

    c. All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

    d. All photographs or videos;

    e. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

    f. All applications designed for receiving electronic payments and the stored contents of those apps, including but not limited to CashApp;

    g. All web browsing history;

    h. All evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

19
Case 2:18-mj-00142-DEJ    Filed 08/31/18    Page 20 of 20    Document 1